IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

**STATE OF TENNESSEE v. LAWRENCE TAYLOR III aka "PIG"**

**Appeal from the Circuit Court for Tipton County**
**No. 6941      Joe H. Walker, III, Judge**

_____

**No. W2015-01693-CCA-R3-CD  -  Filed August 31, 2016**

_____

The defendant, Lawrence Taylor III, aka "Pig," was indicted for first degree murder, especially aggravated kidnapping, and aggravated assault. After trial, a jury found the defendant guilty of the lesser-included offense of second degree murder, especially aggravated kidnapping, and aggravated assault. The defendant argues on appeal that the guilty verdict is not supported by the evidence and the trial court improperly admitted a prior written statement of an unavailable witness into evidence. The State argues the evidence was sufficient to sustain the convictions, and the trial court properly allowed the witness's prior statement to be read into evidence. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed.**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Richard McFall, Covington, Tennessee, for the appellant, Lawrence Taylor, III, aka "PIG".

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; D. Mike Dunavant, District Attorney General; and Walt Freeland, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual and Procedural History*

This case arises out of the brutal assault and murder of the victim, Mika Jefferson, at a meeting of the Gangster Disciples on August 5, 2009. The defendant, Lawrence Taylor III, aka "Pig," was subsequently charged with felony murder, especially aggravated kidnapping, and aggravated assault. The case proceeded to jury trial, where the below-summarized proof was presented.

The State called Carl Jefferson, the victim's father, as its first witness. Mr. Jefferson testified that to his knowledge, the victim did not have any health issues at the time of his death. When he left for work the morning of his son's death, Mr. Jefferson observed the victim in bed sleeping. When Mr. Jefferson returned home that evening, he learned of his son's death and subsequently identified his son's body.

The State next called Tangela Jefferson, the victim's wife, to testify. Mrs. Jefferson testified that the victim served two terms in Iraq and, at the time of his death, had been out of the military about a year. To her knowledge, the victim did not have any health issues. Mrs. Jefferson identified a photograph of the victim and confirmed it to be an accurate depiction of the way he looked at the time of his death.

Maurice Nash testified as the State's next witness and was, overall, uncooperative. Mr. Nash confirmed he was wearing a shirt with a picture of the Godfather holding a raised handgun and stating, "We live and die by the code of silence." Mr. Nash confirmed he has a long list of prior felony convictions, including aggravated assault, reckless endangerment, tampering with evidence, and numerous drug-related convictions. Mr. Nash admitted to being a member of the Gangster Disciples, but testified he later resigned while in prison. Mr. Nash confirmed the Gangster Disciples are governed by a hierarchy of power, including positions of authority like governor and chief of security. Mr. Nash testified that he has never known the defendant to be a member of the Gangster Disciples and has never attended a Gangster Disciples meeting with him.

The State next called Eddie Walker, who was a sergeant with the Munford Police Department at the time of the victim's death. Sergeant Walker testified that around 5:00 p.m. on August 5, 2009, he responded to a call to Sparky's Exxon. On his way, he drove past the residence located at 175 West Main Street in Munford, Tennessee, approximately a mile from Sparky's Exxon, and noted about eight to ten cars and twenty to twenty-five people outside of the home. When he arrived at Sparky's Exxon, he discovered Quinton Weathers, Octavious Jones, and the victim inside a vehicle. According to Sergeant

Walker, the victim was unresponsive with his eyes rolled in the back of his head. Paramedics also arrived at the scene and removed the victim from the car, put him on a stretcher, and began life-saving techniques. Sergeant Walker treated the call as an investigation into the victim's death and reported it to Captain Randall Baskin and Investigator Salayi, both with the Munford Police Department. The investigation was subsequently turned over to the Tennessee Bureau of Investigation ("TBI").

On cross-examination, Sergeant Walker admitted that he did not know what kind of car the defendant drove on August 5, 2009, so he could not say whether it was one of the cars he saw outside of 175 West Main Street. He also confirmed that he did not see the defendant, who was in a wheelchair at the time, congregating outside of the residence. However, he only observed the residence on his way to Sparky's Exxon and did not go inside.

The State next called Allen Smith, a member of the Gangster Disciples. The witness positively identified the defendant in the courtroom as Lawrence Taylor, also known as "Pig." Allen Smith testified that in August 2009, both his brother, Chillibo Smith, and the defendant were members of the Gangster Disciples. On August 5, 2009, Allen and Chillibo were together when Chillibo received a call about a position of authority meeting of the Gangster Disciples that was to be held at his house in Munford later that day. Allen Smith testified that he, Chillibo Smith, the defendant, and Maurice Nash, who is also called "Monster," attended the meeting, as did many other members. He also identified a photograph of a small shed as the shed in the backyard of 175 West Main Street, where the meeting at issue took place.

Allen Smith further testified that he was asked to serve as security at the meeting, but he did not do it because others were already outside acting as security. Instead of attending the meeting, the witness stayed inside the house in his brother's bedroom. From the bedroom, the witness could hear some of the meeting. He heard the defendant say that the victim had to receive a six-minute violation, which meant that as a result of doing something wrong, the victim would be beaten for six minutes. During the beating, the victim was not permitted to protect himself from the punches or fight back.

Allen Smith stated that he wrote a statement for a TBI agent around 3:00 a.m. the morning after the beating occurred. In the statement, Mr. Smith said that the defendant was the highest ranking Gangster Disciple in Tipton County. However, it is now his understanding that the victim was actually the highest ranking member.

Allen Smith initially testified that the defendant ordered the beating. However, on cross-examination, he testified that the defendant passed the order along from somebody that was not at the meeting. According to Allen Smith, Quinton Weathers was the chief

enforcer and charged with keeping time during the beating. Durrell Davis and Quinton Weathers brought the victim into the house following the beating. When Allen Smith noticed that the victim was gagging for breath, he gave him a towel and water. He also helped the victim to the car so he could get help. The victim then left in a car with Octavious Jones and Quinton Weathers. Afterwards, the defendant told everybody to get in their cars, leave, and not say anything. According to the statement Allen Smith gave to the TBI, the defendant said, "Don't say anything or you get the same thing done to you." Allen Smith confirmed this is part of the code of silence of the Gangster Disciples.

Dr. Lisa Funte, M.D., a forensic pathologist, testified as the next witness for the State. In 2009, Dr. Funte was with the Shelby County Medical Examiner's Office and performed the autopsy on the victim. Dr. Funte's autopsy report lists the victim's cause of death and manner of death. According to Dr. Funte, the cause of death is the event that sets the physiological changes that result in the death of the individual into motion. Dr. Funte determined the cause of death to be blunt force injuries associated with hypertensive and atherosclerotic cardiovascular disease. The manner of death describes how the death occurred. There are five different categories of the manner of death – natural, accident, suicide, homicide, and undetermined. Dr. Funte determined the manner of death to be homicide.

According to Dr. Funte, when performing an autopsy, pathologists look for indications of trauma and natural disease. On her external examination of the victim, Dr. Funte found evidence of blunt force injuries. There were contusions on the victim's torso and extremities. There were also abrasions and a laceration on his back. When looking for natural diseases, Dr. Funte noted the victim had severe cardiovascular disease, evidenced by an enlarged heart, a thick left ventricular wall, plaque build-up in the arterial walls, an eighty percent blockage in one coronary artery, and a seventy percent blockage in another coronary artery.

Dr. Funte opined that when the victim was beaten, his body had a fight-or-flight response, causing increased blood pressure, increased heart rate, and vascular constriction. In an individual like the victim with coronary artery disease, this fight-or-flight response can cause decreased blood flow or an irregular heartbeat and result in death. According to Dr. Funte, this is why the combination of blunt force trauma and cardiovascular disease caused his death.

Dr. Funte also declared the manner of the victim's death to be homicide. She subsequently admitted that the manner of death could have been marked on the autopsy report as "undetermined." However, Dr. Funte testified that it is important for a forensic pathologist to have knowledge of the circumstances immediately preceding an individual's death. Knowledge that the individual had been beaten by three young males

immediately before he became short of breath and was pronounced dead is an important factor. Dr. Funte's autopsy and toxicology report was marked Exhibit 6. This report stated that prior to being found non-responsive, the victim had "reportedly been beaten by members of his gang."

The State's next witness was Charles Anthony Smith, also known as Chillibo. He testified that on August 5, 2009, he was a member of the Gangster Disciples and held a Gangster Disciples meeting at his residence located at 175 West Main, Munford, Tennessee, which was attended by the defendant, his brother, the victim, and others. He also confirmed that the defendant was a member of the Gangster Disciples and held a higher rank in the organization than he did.

According to Chillibo Smith, the meeting took place in his backyard. A man identified as "Skinny" brought the victim to the meeting. Skinny had a position of authority within the Gangster Disciples, possibly governor. According to Chillibo Smith, the defendant and Skinny discussed what to do with the victim, as he had not been participating in the gang and was not paying his dues. He also testified that the defendant announced he had been told that the victim would have to take a beat down. The witness believed this order came from higher in the chain of command, and the individual that actually ordered the violation was not present at the meeting. Chillibo Smith had previously given a slightly different statement to the TBI investigator shortly after the event, when he instead stated that "[d]uring the discussion Pig stated that [the victim] had to take a beat down for six mins. with no cover up." After the defendant announced the victim's punishment, three men from Stanton, Tennessee, who had lower rankings in the gang than the defendant, then took the victim into a shed in the backyard and beat him for six minutes.

Chillibo Smith testified that the victim was still alive after the beating, but he was tired, sweating, and breathing hard. The men who beat him were also tired and out of breath. The victim was taken inside the house and given wet towels. At some point, he collapsed in the living room, and Quinton Weathers and Octavious Jones took him to the hospital.

Quinton Weathers testified next. Mr. Weathers admitted to previously pleading guilty to facilitation of second degree murder in connection with the victim's death. Mr. Weathers was present at the meeting on August 5, 2009. He knew the victim and heard from Chillibo Smith that the victim would receive a violation at the meeting.

Mr. Weathers referred to Gangster Disciples by the name of Growth and Development. He stated that he is the chief of security for the organization. The defendant was a "region," meaning that he was the person that made sure everybody was

doing their job and not "messing over people." According to Mr. Weathers, the victim, had a higher rank within the organization than the defendant and was over everybody.

Mr. Weathers also testified that there is a disciplinary system within the organization and there was a hierarchy in which orders were given. A violation is one disciplinary action that can be ordered. The victim received a violation because he was extorting people, although Mr. Weathers admitted to previously telling the TBI investigator that the victim received the violation as a result of not paying his dues.

According to Mr. Weathers, he attended the meeting because the defendant instructed him to come. After the meeting was called to order, the defendant gave the victim the choice to take the six-minute violation or walk away from the organization, and the victim decided to take the violation. In his statement to the TBI, Mr. Weathers stated that the defendant said the victim had to choose to walk away or take the violation. At trial, Mr. Weathers instead testified that the defendant stated that he had been told that the victim had to walk away or take the six-minute violation.

Mr. Weathers testified that a violation, or beat down, means other gang members hit you and you cannot hit back. The members can only hit below the face and cannot kick or stomp the person. The person being beaten is allowed to cover-up. If the person being beaten falls, then a minute is taken off of the total time.

Mr. Weathers stated that three gang members from Stanton, Tennessee administered the violation inside a shed in the back of the house. All three men fought the victim at once, but the victim was permitted to cover himself. In addition to the three people beating the victim, there were two people watching to make sure the discipline did not go too far and a time keeper. According to Mr. Weathers, the victim brought this on himself and could have stopped the beating and did not.

The victim was alive following the beating and was given a glass of water. He then collapsed on his way to the car. The victim appeared stable until he got to the car.

Next, the defendant called his expert, Brian Spencer Frist, M.D., out of order. Dr. Frist testified as a paid expert witness and charged the defendant $250.00 an hour for case work and $125.00 an hour for travel time. Dr. Frist testified that he is a retired medical examiner from Cobb County, Georgia. He was hired by the defendant to review Dr. Funte's autopsy report and determine the manner and cause of the victim's death.

Dr. Frist opined that the injuries the victim sustained during the beating on August 5, 2009, did not cause his death. The beating caused contusions, abrasions, and some minor lacerations to his torso and extremities. These injuries were limited to the victim's

skin and underlying soft tissues. His internal organs were intact and showed no evidence of injury and his brain was intact and showed no evidence of trauma. According to Dr. Frist, the beating did not cause life threatening injuries.

Additionally, Dr. Frist testified that the cause of death was cardiovascular disease. Dr. Frist opined that the victim's heart was enlarged because he suffered from hypertension. Further, of the three main arteries feeding blood to the heart, two showed significant compromise. One artery had an eighty-percent blockage, and the second had a seventy-percent blockage. Due to the severity of the blockages, it was possible for the victim to have a heart attack and die at any time without symptoms.

Dr. Frist disagreed with Dr. Funte regarding the manner of death and testified that he would have declared the manner of death undetermined, not homicide. The victim had significant heart disease, and in all probability, he died as a result of this heart disease. Dr. Frist opined that he cannot make a correlation between the beating and the victim's subsequent death.

Dr. Frist stated that nobody can know whether the beating shortened the victim's life. While it is possible that the beating impacted the victim's adrenaline, he was voluntarily beaten. It is more likely that a beating the victim did not know about in advance would cause an adrenaline spike. Dr. Frist also noted that the victim was under the influence of marijuana at the time of the beating, which would have calmed him. Dr. Frist opined that he cannot rule out the possibility that the victim had a heart attack simply because it was his time to have one.

When the State resumed presenting its proof, its next witness was Durrell Davis. In response to every question, Mr. Davis stated, "I ain't got nothing to say" or "I plead the Fifth." Mr. Davis then refused to look at the statement he previously gave to the TBI. Due to his refusal to cooperate, the trial court determined Mr. Davis was unavailable to testify.

Anthony Carney was the next witness for the State. Mr. Carney testified that he previously pled guilty to facilitation of second-degree murder in connection with the August 5, 2009 beating. He confirmed that he is a member of the Gangster Disciples and attended the meeting at issue. Mr. Carney lived in Brownsville, Tennessee at the time and was picked up in Stanton, Tennessee to ride with Trevor Watkins and James Piggie, Jr., to the meeting.

Mr. Carney testified that he did not have a position of authority in the Gangster Disciples at the time of the meeting. He was just an outstanding member. According to Mr. Carney, Octavious Jones told Mr. Carney, Mr. Watkins, and Mr. Piggie to administer

a violation on the victim. They were told not to hit the victim in the face and that he was permitted to cover himself. They were to beat the victim until told to stop. They were also told that if they refused to comply with the order to beat the victim, they too would receive a six-minute beating.

Mr. Carney confirmed that the violation was administered in the shed at Chillibo's house. According to Mr. Carney, after three minutes they were told to stop so the victim could have a break. Mr. Carney testified that he panics inside enclosed environments and began panicking in the shed while administering the blows. When they broke after three minutes, he stopped and left the shed. Mr. Carney testified that it was really hot in the shed, and he was worn out and could not do it anymore. Following the break, the other two men resumed beating the victim.

Following the beating, Mr. Carney saw the victim leave the shed. He was having trouble breathing. They brought him into the house and asked whether he wanted water. The victim was then taken to get help. Mr. Carney left a few minutes after the victim was taken to the hospital.

The State's next witness was Trevor Watkins, who had also previously pled guilty to a reduced charge of facilitation of second-degree murder in connection with the victim's death. Mr. Watkins confirmed he attended the meeting at issue. He did not have a position of authority in the gang at the time and was only an outstanding member. Mr. Watkins also confirmed that Quinton Weathers told Anthony Carney, James Piggie, and him to administer the beating and that the beating occurred in a shed in the backyard of the house. Mr. Watkins testified that the shed was hot, and following the beating, all the men who participated in the beating were exhausted. The victim was too tired to do anything, so he was taken to get help. Mr. Watkins claimed that he did not see the defendant or anybody in a wheelchair at the meeting. He also claimed that he did not receive any orders from the defendant.

The State's final witness was TBI Agent Mark Reynolds. Agent Reynolds testified that he investigated the victim's death and, as part of his investigation, took the statements of several witnesses, including Durrell Davis. Over the objection of defense counsel, the following statement of Durrell Davis was admitted and read into evidence as a prior inconsistent statement:

> I received a call earlier the day M.J.[1] was killed. The call came from Chillibo, and he stated that we were going to have a barbecue at his house

---

[1] Testimony at trial indicated that the victim was known as "M.J."

around 4:00 p.m. I arrived at Chillibo's house around 3:45 p.m. When I got there it was about 10 to 12 people from Stanton, Tennessee. Big Al, Antwan Dowell, and myself went together. When we got out we shook hands with everyone.

And around four o'clock [the defendant] and several other people from Covington, Tennessee, pulled up. There were several people that I had never seen before get out. [The defendant] stated that this was not a barbecue. It was a P.O.A. meeting. At that time [the defendant] asked me to start searching and make sure all phones were turned off and move everyone to the back of the house.

I began doing the search and that's when the two guys from Chapel Hill pulled up with M.J. in the car with them. He was under what I call G.D. arrest. They pulled up in a white Grand Marquis. I believe it was Frank Pewitt's car, and Terrance Miles was the other guy with them. The last people to get searched was Pewitt, Miles, and M.J. We all got into the circle and Matt Sketch, Abdullah Kindred from Covington opened the meeting up. He opened the meeting with the creed, and then the issue with M.J. wanting to get out because he didn't want to be a G.D. anymore.

M.J. explained to them that he was just mad at the time and that he really didn't want out. M.J. was mad because they were accusing him of not paying his dues like he was supposed to. [The defendant] made a call to Milwaukee to M.J.'s cousin, which is considered his Don, the person that got him in the G.Ds. This call was to let him know that M.J. wanted to get out, but really M.J. was wanting back in, in good standing. His cousin said whatever Nut decided to do, then that's what M.J. had to do.

Nut, [the defendant], and Train had already conversed and made a decision that M.J.'s violation would be a six-minute cover up. This violation was due to M.J.'s ignorant outburst about getting out. And to show his loyalty to G.D. he had to take the six-minute cover up. Sketch closed the meeting by saying the rest of the creed. You only say half the creed to start the meeting, and say the rest to close the meeting.

After the meeting was closed, Train picked three guys from Stanton, Tennessee, to serve the violation. He picked me to hold the clock, which was a cell phone with a stop watch on the phone. It was Terrance Miles's phone. The three guys from Stanton had to have already been chosen

because they were not P.O.A.s and they would not be there if they were not already chosen.

[The defendant] talked to Train, and [the defendant] made sure Train told me how to do the time. I told them I didn't want to hold the clock, and [the defendant] said that I had to, and if I didn't want to, I could get the same violation. His words were, "I'm a penitentiary gangster, and I don't need any soft niggas around me."

Train came over to me and got the clock set up – got the clock set up right and told the three guys to start and started the clock. After about two minutes into it, Monster walked back there. [The defendant] sent Monster back there to make sure the clock was going and it was being done. Train left and went back around front for a minute.

After about four minutes into it M.J. was leaning against the shelf in the shed. You are supposed to get a break after three minutes, but they wanted his time to be six minutes straight. After about four [minutes], I asked Monster if we could cut it short, and Monster said no, it had to be six minutes. Train came back just before six minutes was over and watched until time was up.

After it was over, instead of making M.J. walk back into the house, Monster and Train carried M.J. into the house. After M.J. had been in the house for about ten minutes, Chillibo's girl was coming home and Chillibo wanted the house cleared out. Train and Monster carried M.J. to Frank Pewitt's car, the white Grand Marquis, that had come in and – that he had come in, and put him in the car.

After about five minutes of M.J. being in the car, he stopped breathing. Train got in the car and pumped him, his chest, and M.J. started breathing again. That's when I believe it was Antwan Dowell stood in the street and blocked the road. Octavious Jones got into the car and drove M.J. to the hospital, and Train in the front of the car. To tell you the truth, I'm not sure if the Grand Marquis was Frank Pewitt's or Octavious Jones's car, but that was – that is the car M.J., Frank Pewitt, and Terrance Miles arrived in earlier.

From there everybody left. Before we all left, [the defendant] told everyone that if anyone talks, they would be dealt with as an enemy of the organization, the organization meaning Gangster Disciples. Being dealt

with as an enemy means death. I left with Big Al and Antwan Dowell. We went to Penny Pantry in a black Maxima, which was driven by Big Al, and went inside. Before we went inside, we talked to three guys that served the violation. They were in a blue-green Crown Vic. They never came inside the Penny Pantry. We went inside and watched the ambulance take M.J. off.

A little bit later that night Big Al told me that M.J. had died, and was really concerned. Big Al was ready to kill himself because he was stressing about the police taking Chillibo's girl's kids because it happened at her house.

This is a true and accurate statement, voluntarily given by me, without any promises or coercion made to me. Signed by Durrell Davis.

Agent Reynolds testified that at the same time he gave the statement, Mr. Davis listed the names of the Gangster Disciples members present at the meeting and their positions within the gang. Agent Reynolds further testified that Mr. Davis identified the defendant as the A.G. over West Tennessee. Per Agent Reynolds, Mr. Davis voluntarily waived his right to have a lawyer present at the time he gave the statement.

At the conclusion of Agent Reynolds' testimony, the State rested. The defendant subsequently moved for directed verdict. The trial court denied the motion. The defense then rested without presenting additional proof.

The jury found the defendant guilty of second-degree murder, especially aggravated kidnapping, and aggravated assault. At a subsequent sentencing hearing, the defendant received a concurrent sixty-year sentence. The defendant then filed a motion for a new trial or judgment of acquittal, which was denied by the trial court, followed by this timely appeal.

On appeal, the defendant argues the guilty verdict is not supported by the evidence, as the medical examiner admitted the manner of death could have been ruled undetermined, the defendant's expert testified the injuries sustained by the victim during the beating did not cause his death, and there was no corroboration apart from accomplice testimony to implicate the defendant. The defendant further argues that the trial court improperly admitted the hearsay statement of Durrell Davis into evidence. The State argues the evidence was sufficient to sustain the convictions, and the testimony of accomplices presented at trial was corroborated. The State further argues any errors committed by the trial court when admitting Mr. Davis' statement were harmless, because the statement was cumulative of evidence in the record. We agree with the State and affirm the judgments of the trial court.

## *Analysis*

## I.    Sufficiency of Evidence

The defendant first challenges the sufficiency of the evidence, arguing the evidence was insufficient to sustain the second degree murder convictions. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans,* 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson,* 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas,* 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State,* 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown,* 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State,* 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011)

(quoting *State v. Hanson,* 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell,* 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes,* 331 S.W.3d at 379 (citing *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

At trial, the State relied on a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or both." Tenn. Code Ann. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

The defendant need not physically participate in the crime in order to be criminally responsible. *Phillips v. State*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). To be criminally responsible for the acts of another, the defendant must: "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235,239 (Tenn. Crim. App. 1976)). The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

The defendant does not challenge the specific proof needed to establish each element of second degree murder, especially aggravated kidnapping, and aggravated assault. Rather, based on Dr. Funte's admission that the manner of death could have been undetermined and Dr. Frist's testimony that the injuries sustained during the beating did not cause the victim's death, the defendant argues there was no murder and the evidence did not support the verdict. The defendant further asserts that there was insufficient corroboration of accomplice testimony. These arguments are without merit.

- 13 -

## A.     Manner of Death

The defendant first argues that the jury's verdict is not supported by the evidence because Dr. Funte admitted on cross-examination that she could have found the victim's manner of death to be undetermined rather than homicide. According to the defendant, "[i]f the medical examiner stated [the] manner of death could have been ruled undetermined then you have no homicide and you can have no conviction." The defendant cites no authority in support of this argument.

Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on [.]" Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Crim. App. R. 10(b); *see also State v. Sanders*, 842 S.W.2d 257, 259 (Tenn. Crim. App. 1992) (determining that issue was waived where defendant cited no authority to support his complaint.) The defendant's argument has been waived.

Regardless, the defendant's argument is also without merit. The defendant essentially challenges the credibility of Dr. Funte's testimony in comparison to that of Dr. Frist. This Court is not to reweigh the evidence on appeal. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Instead, all questions concerning the credibility of the witnesses, and the weight and value to be given the evidence, are to be determined by the trier of fact. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). When viewing all evidence presented at trial in a light most favorable to the prosecution, rather than considering only the admission made by Dr. Funte as to the potential manner of death, a rational trier of fact could have found, beyond a reasonable doubt, that the defendant's order killed the victim.

At trial, multiple witnesses testified that there was a hierarchy of power within the Gangster Disciples and a disciplinary system in place. At least three witnesses identified the defendant as a member of the Gangster Disciples and indicated he had a high rank within the organization. There was proof that the defendant attended the Gangster Disciples meeting at the residence located at 175 West Main Street, Munford, Tennessee, on August 5, 2009, around 4:00 p.m. At least three witnesses indicated that they saw or overheard the defendant order the victim to succumb to a six-minute beating. Those witnesses later testified that this order did not come directly from the defendant. Rather, the defendant was communicating an order from a more senior, absent, member of the Gangster Disciples. Regardless of where the order originated, the outcome was

undisputedly the same – the victim endured a six-minute beating at the hands of three junior members of the organization, and the defendant delivered the order ensuring this beating occurred. The possibility that the defendant was relaying an order requiring the victim receive a six-minute beating, rather than directly issuing the order himself, does not absolve him. *See State v. Robinson*, No. W2001-01299-CCA-R3-DD, 2003 WL 21946735, at *11 (Tenn. Crim. App. Aug. 13, 2003) (holding that evidence supported a conviction of criminal responsibility for first degree murder where the defendant, on directive from a more senior member of the Gangster Disciples, ordered others to carry out a murder), *rev'd in part on other grounds*, 146 S.W.3d 469 (Tenn. 2004).

The witnesses consistently testified that the beating took place inside of a shed located in the backyard of the residence. In addition to the three men solicited to beat the victim, there were three additional Gangster Disciples present in the shed to keep time and ensure the execution of the defendant's order that the victim receive a six-minute beating. There was conflicting evidence regarding whether the victim was permitted to cover himself during this beating, but at least two witnesses testified that the victim could not fight back. The beating occurred in August, and according to the men who beat the victim, it was hot inside the shed. It was so hot in the small, confined space, that Mr. Carney, who testified that he panics in such areas, had to leave the shed after three minutes and could not continue the beating. Following a break, the two remaining men solicited to beat the victim continued to do so for another three minutes. All the men who participated where exhausted following the beating.

It is undisputed that the victim collapsed following the beating and was taken to get help. The police officer who responded to the emergency call testified that around 5:00 p.m. on August 5, 2009, approximately an hour after the Gangster Disciples meeting began, he found the victim unresponsive in the back of a car. According to Dr. Funte, the medical examiner who performed the victim's autopsy, the victim was pronounced dead at 6:12 p.m. on August 5, 2009. Dr. Funte listed the victim's cause of death as "[b]lunt force injuries associated with hypertensive and atherosclerotic cardiovascular disease." Dr. Funte testified that in response to the beating, the victim had a fight-or-flight response, causing increased blood pressure, increased heart rate, and vascular constriction. Due to the victim's underlying severe heart disease, this flight-or-fight response caused a heart attack and the victim's death.

The defendant called his own expert witnesses, Dr. Frist, who testified that the injuries sustained by the victim during the beating were not life-threatening and did not result in his death. Dr. Frist further testified that due to the victim's severe heart disease, he could not rule out the possibility that this was simply the victim's time to have a heart attack. However, based on Dr. Funte's testimony regarding her autopsy and the underlying facts, including the proximity in time of the victim's death to the beating

inside the shed, a rational trier of fact could have found the beating, ordered by the defendant, resulted in the victim's death.  Additionally, we note that the jury is not required to give weight to expert testimony.  By finding the defendant guilty, it is clear that the jury resolved any conflict between the two experts in favor of the State.  The evidence is sufficient to support the defendant's second degree murder, especially aggravated kidnapping, and aggravated assault convictions.

### B.    Corroboration of Accomplice Testimony

In further support of his challenge to the sufficiency of evidence presented at trial, the defendant contends there has been no corroboration apart from accomplice testimony that implicates the defendant in this case.  The State argues Allen Smith positively identified the defendant as being present at the Gangster Disciples meeting and ordering the six-minute beating, and despite being a member of the Gangster Disciples, he did not unite with the defendant in the commission of the offenses, so he was not an accomplice. We agree with the State.

The defendant is correct that, when the only proof of a crime is the uncorroborated testimony of one or more accomplices, then the evidence is insufficient to sustain a conviction as a matter of law.  *State v. Collier,* 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little,* 402 S.W.3d 202, 211-12 (Tenn. 2013)).  Additionally, accomplices cannot corroborate each other.  *State v. Boxley,* 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime."  *State v. Allen,* 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997).  This means that the person must do more than have a guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor.  *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001). The test for whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *State v. Allen*, 976 S.W.2d at 666.

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, our Supreme Court has noted that the corroboration required can be slight.  The Court stated that in order to properly corroborate accomplice testimony:

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.  The corroborative

evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

*State v. Shaw,* 37 S.W.3d 900, 903 (Tenn.2001) (quoting *State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn. 1994)).

Moreover, independent evidence, although slight and entitled to little weight when standing alone, is sufficient to corroborate accomplice testimony. *State v. Heflin,* 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, evidence that merely casts suspicion on the accused is inadequate to corroborate an accomplice's testimony. *Boxley,* 76 S.W.3d at 387. The sufficiency of the corroboration is a determination entrusted to the jury as the trier of fact. *Shaw,* 37 S.W.3d at 903.

At trial, Allen Smith positively identified the defendant as being present in the courtroom. He also testified that the defendant was present at the Gangster Disciples meeting on August 5, 2009. According to Allen Smith, he heard the defendant order the six-minute beating, or at least relay somebody else's order that the victim receive a six-minute beating. Allen Smith testified that the victim received the beating, and afterwards, he appeared to be gagging for breath. Allen Smith stated that he gave the victim a towel and water and then helped him to the car. After the victim was taken to get help, the defendant told everybody to get in their cars, leave, and not say anything.

Allen Smith's presence at the August 5, 2009 meeting does not implicate him in the assault, kidnapping, and murder of the victim in such a way as to make him an accomplice. *See Jackson*, 52 S.W.3d at 666 (evidence sufficient where the witness, who was a fellow gang member, was merely present for the events involving the victim but did not actively engage in the activity that resulted in the kidnapping and murder charges). Allen Smith did not order the six-minute beating or participate in the carrying out of the order. The testimony of Allen Smith, as a non-accomplice, sufficiently identified the defendant as a criminal actor and corroborated the testimony of the accomplices who testified at trial. The evidence is sufficient to support the defendant's convictions.

## II.    Admission of Prior Written Statement

The defendant argues that the trial court erred in allowing the prior statement of Durrell Davis to be read to the jury, as the defense never had an opportunity to question Mr. Davis regarding the veracity of his written statement. The defendant further

- 17 -

contends that the trial court's admission of the prior written statement as substantive evidence violated his right to confront his accusers. In response, the State argues that any error in declaring Mr. Davis unavailable was harmless; the trial court admitted the statement under a rule that does not require the witness to be unavailable; and the defendant waived his Confrontation Clause argument by raising it for the first time on appeal. We find that the trial court properly allowed the statement to be read into evidence and any error in the procedure followed when doing so is harmless.

## A.      Statement Against Interest

Our Supreme Court has recently announced the following standard of review with regard to hearsay:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule – are questions of law subject to de novo review.

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (internal citations omitted), *cert. denied*, 2015 WL 5032354 (U.S. Oct. 13, 2015).

We acknowledge that Mr. Davis' written statement was hearsay, defined as "a statement other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible unless an exception applies. Tenn. R. Evid. 802. When the trial court finds the witness to be unavailable, the admission of a "statement against interest" is one such exception. Tenn. R. Evid. 804(b)(3).

Pertinent to this case, a witness who "persists in refusing to testify concerning the subject of the declarant's statement despite an order of the court to do so" is "unavailable." Tenn. R. Evid. 804(a)(2). After a declarant is found to be "unavailable," the hearsay rule does not exclude certain evidence, including a "statement against interest", which pertinent to this case is "[a] statement . . . so far tended to subject the

declarant to . . . criminal liability to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Tenn. R. Evid. 804(b)(3).

The State subpoenaed Mr. Davis to testify at trial, but when called as a witness, he repeatedly refused to answer, stating, "I ain't got nothing to say," and "I plead the Fifth." In response, the State moved the trial court to find him unavailable, and the court agreed. While Mr. Davis was on the stand, the defendant could have attempted cross-examination, but did not. After finding Mr. Davis to be unavailable due to his refusal to testify, the trial court permitted Agent Reynolds to read Mr. Davis' statement into evidence as a "statement against interest." In this statement, Mr. Davis admitted to keeping time while the victim received the six-minute beating, an act which could subject Mr. Davis to criminal liability and for which he had previously pled guilty to aggravated kidnapping.

It is undisputed that Mr. Davis refused to testify when called as a witness at trial, making him unavailable. While the trial court did not technically order Mr. Davis to testify prior to declaring him unavailable pursuant to Rule 804(a)(2), the witness was present at trial in response to a subpoena and called as a witness for the State. To the extent the trial court's approach to declaring Mr. Davis unavailable could be considered error, any error in failing to technically order Mr. Davis to testify was harmless. Once the trial court found Mr. Davis to be "unavailable," the statement against interest given to Agent Reynolds was no longer excludable as hearsay. The trial court properly allowed Agent Reynolds to read the statement into evidence at trial. Moreover, because the statement was cumulative of proof already in the record, if the trial court had erred when allowing the statement to be read into evidence, the error would be harmless.

## B.      Right of Confrontation

Whether the admission of hearsay statements violated a defendant's confrontation rights is a question of law subject to de novo review. *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) (citing *State v. Lewis,* 235 S.W.3d 136, 141-42 (Tenn. 2007)). The proper application of that law to the trial court's factual findings is likewise a question of law, subject to de novo review. *Lewis*, 235 S.W.3d at 142 (internal citations omitted).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI. Similarly, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. These provisions embrace "the right to physically face the witnesses who testify against the defendant and the right to cross-examine witnesses."

*State v. Williams,* 913 S.W.2d 462, 465 (Tenn. 1996).  "[W]hen deciding claims based on the right of confrontation provided in article I, section 9, our Supreme Court has expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment."  *State v. Dotson,* 450 S.W.3d 1, 62 (Tenn. 2014) (citing *State v. Parker,* 350 S.W.3d 883, 898 (Tenn. 2011).  In this regard, our Supreme Court has determined:

> When the prosecution seeks to introduce a declarant's out-of-court statement, and a defendant raises a Confrontation Clause objection, the initial determination under *Crawford* [*v. Washington,* 541 U.S. 36, 68 (2004)] is whether the statement is testimonial or nontestimonial.  If the statement is testimonial, then the trial court must determine whether the declarant is available or unavailable to testify . . . If the declarant is unavailable, the trial court must determine whether the accused had a prior opportunity to cross-examine the declarant about the substance of this statement.  *Id.* at 68.  If the accused had such an opportunity, the statement may be admissible if it is not otherwise excludable hearsay.  If the accused did not have this opportunity, then the statement must be excluded.

*State v. Maclin,* 183 S.W.3d 335, 351 (Tenn. 2006).

The Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination to whatever extent the defendant wishes.  *United States v. Owens*, 484 U.S. 554, 559-60 (1988).  Our Supreme Court, therefore, recently held that "even when a trial court admits a witness' hearsay statements as substantive evidence, and the witness claims at trial not to remember the information contained within the hearsay statements, the Confrontation Clause is not violated when a defendant has the opportunity to cross-examine the witness at trial."  *Davis*, 466 S.W.3d at 69 (affirming the admission of preliminary hearing testimony and a prior statement of a testifying witness as substantive evidence where that witness testified at trial that he could not remember giving the statement or testifying at the preliminary hearing, so he was declared to be "unavailable," and the defendant had the opportunity to cross-examine the witness on the subject).

The State called Mr. Davis as a witness at trial, and after taking an oath to testify truthfully, Mr. Davis refused to answer questions or look at documents.  Much like a witness whose memory has lapsed, Mr. Davis repeatedly stated, "I ain't got nothing to say."  The defendant could have cross-examined Mr. Davis but did not.  While he was less than forthcoming, because Mr. Davis testified at trial and could have been subject to cross-examination, the trial court did not violate the defendant's federal or state

confrontation rights when allowing Agent Reynolds to read Mr. Davis' out-of-court statement into evidence. The defendant is not entitled to relief on this basis.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE